Filed 4/17/25  S.S. v. L.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|---|---|
| S.S.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>L.S.,<br><br>Defendant and Respondent. | F088078<br><br>(Super. Ct. Nos. FC-21-000249 & FL-23-000316)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br>[NO CHANGE IN JUDGMENT] |

It is ordered that the nonpublished opinion filed herein on April 14, 2025, be modified as follows:

1. The caption should list the superior court case Nos. as FC-21-000249 and FL-23-000316.

There is no change in the judgment.

This court will deem appellant's "PETITION FOR REHEARING," "REQUEST FOR RECONSIDERATION OF APPELLATE COURT'S DECISION," "FORMAL REBUTTAL TO APPELLATE COURT OPINION," "LETTER TO THE COURT REGARDING UNLAWFUL DENIAL OF PARENTAL CONTACT," which were all filed on April 15, 2025, his "SUPPLEMENTAL BRIEF IN SUPPORT OF PETITION FOR REHEARING" and "SUPPLEMENTAL REPLY TO APPELLATE COURT OPINION DATED APRIL 14, 2025," which were both filed on April 16, 2025, and his "SUPPLEMENTAL CLARIFICATION OF CONSTITUTIONAL ARGUMENT IN

SUPPORT OF PETITION FOR REHEARING," "SECOND SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF PETITION FOR REHEARING," and "SUPPLEMENTAL NOTICE IN SUPPORT OF PETITION FOR REHEARING," which were filed on April 17, 2025, as a combined petition for rehearing.  The petition for rehearing is denied.

No further documents will be accepted for filing on this matter.

DE SANTOS, J.

WE CONCUR:

LEVY, Acting P. J.

MEEHAN, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| S.S.,<br><br>     Plaintiff and Appellant,<br><br>          v.<br><br>L.S.,<br><br>     Defendant and Respondent. | F088078<br><br>(Super. Ct. Nos. FC-21-000249<br>& FC-23-000316)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Joseph R. Distaso, Judge.

S.S., in pro. per., for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

-ooOoo-

S.S. (father) appeals a final order awarding sole physical and legal custody of his now 14-year-old daughter, J.S. (daughter), to daughter's mother, L.S. (mother), and suspending his visits until he receives a minimum of six months of therapy from a licensed therapist.  Father contends his constitutional rights were violated during the proceedings, the family court judge was biased against him, and daughter's right to testify as provided in Family Code section 3042 was violated.  Mother did not file a

respondent's brief.[1]  Finding no merit in any of father's numerous contentions, we affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

Father and mother, who never married, met in approximately 2006 while mother was living in the Philippines, and they were together in the United States from about 2007 to 2021.  Mother, who worked as a nurse and purchased the home the family lived in, was the sole breadwinner while father stayed home with daughter, who was born in 2010, until he began working about 10 years into his relationship with mother.  Father and mother separated sometime in 2021, when mother relocated to San Diego, leaving daughter and father in Stanislaus County.

In February and May 2023, father and mother, respectively, filed requests for domestic violence restraining orders against each other.  In May 2023, the family court ordered that the parties should have joint legal custody of daughter with father having sole physical custody.  The court ordered mother and daughter to attend counseling with Yvette Allivato, a licensed marriage and family therapist, with a focus on reunification assessment and counseling.  The matter was continued to September 25, 2023, for an in-court child custody counseling review.

***The Grant of Temporary Custody to Mother***

At the September 25, 2023 hearing, the family court issued custody and visitation orders based on the child custody counselor's recommendation, which father objected to. The family court ordered that daughter be turned over to mother's care that day with mother having sole legal and physical custody, and that daughter's contact with father be

---

**1**      The failure to file a respondent's brief does not constitute a default, i.e., the appealed order is not automatically reversed.  (*In re Bryce C.* (1995) 12 Cal.4th 226, 232; *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1078, fn. 1 ["we do *not* treat the failure to file a respondent's brief as a 'default' (i.e., an admission of error)"].)  Instead, we consider the appellant's brief, independently examine the record on appeal, and reverse only if prejudicial error is found.  (*In re Bryce C.*, at pp. 232–233.)

supervised.  Mother and daughter were ordered to attend counseling with Allivato with a focus on family counseling.  The family court noted that daughter was present during the mediation hearing and father was told to have her leave the room.  Daughter also was present during a brief hearing before the family court.  The matter was continued to December 5, 2023, for an in-court child custody counseling review.

On November 16, 2023, mother filed a request to stop father's visits with daughter pending further recommendation of daughter's treating counselor and sought temporary emergency orders pausing father's visits.  In support of her request, mother explained that daughter had been doing well in her care since the court granted her sole custody, but after father's first supervised visit with daughter on October 26, 2023, daughter's behavior changed drastically to the extent the counselor believed further contact with father would be detrimental to daughter.  There was a fear of self-harm and digression if future visits took place.  The treating counselor filed a treatment summary confidentially. Mother claimed father was continuing to communicate with daughter through daughter's cell phone and sharing court documents.  Mother asserted it would be in daughter's best interest for her to have no contact with father pending further therapy and court order. The family court issued temporary emergency orders denying father contact with daughter pending further court order.

***The Family Court Services Evaluation***

At a December 5, 2023 hearing on mother's request, the family court issued custody and visitation orders based on the child custody counselor's recommendation. The family court referred the matter to a focused "Family Court Services Evaluation," granted mother sole legal and physical custody of daughter, prohibited father's contact with daughter, and granted mother the ability to monitor daughter's access to electronics. The matter was continued to February 22, 2024, for a hearing on the Family Court Services evaluator's report.

3.

On January 16, 2024,[2] mother filed an order to show cause and affidavit for contempt seeking to hold father in contempt for violating the family court's orders. Mother asserted father violated court orders by (1) allowing daughter to be present for the mediation and court hearing, and (2) continuing to communicate with daughter on her cell phone and instructing her not to cooperate with mother, to lie to the mediator, and to hide her contact with him.

On January 31, the family court, on its own motion, reviewed father's request for a copy of the therapy notes and supervised visitation log from the court's file.[3] The family court set a hearing date on this request for February 22.

Jennifer Tercero, a licensed marriage family therapist, filed her Family Court Services evaluator's report (the evaluator's report) on February 22. Tercero recommended, among other things, that: (1) mother have sole legal and physical custody of daughter; (2) daughter's contact with father be prohibited; (3) mother monitor daughter's access to electronics; (4) daughter attend individual counseling with a licensed provider; and (5) father be referred to a psychologist for a psychological evaluation.

That same day, the family court temporarily adopted the evaluator's report and recommendations pending the trial set for March 20 and 21, on the issue of child custody, which also would address father's objection to the evaluator's report. The court stated it also would review and consider each party's requests for domestic violence restraining orders. With respect to father's request for records, the minute order noted that portion was dropped that day. The family court set the hearing on mother's order to show cause for contempt for March 14. The minute order further noted that bailiffs had to escort father out of the courtroom after he repeatedly interrupted the court and raised his voice, despite being admonished not to act out. Father refused to wait after the hearing for the

---

[2]     Subsequent references to dates are to the year 2024, unless otherwise stated.

[3]     Father's request is not in the appellate record.

minute order to be provided to him and swore at the court, stating that the judge was the most "corrupt judge" and family court was "corrupt."

***The Contested Custody Hearing***

At the March 14 hearing on mother's request to hold father in contempt, mother's counsel accepted father's response, which was filed that day. The hearing was continued to March 20. Mother's attorney filed a trial brief and witness list, while father filed a trial brief.

The contested hearing was held on March 20 and 21, which was not reported. The minute order of the March 20 hearing shows that at the outset the family court addressed father and found that father recorded a proceeding on September 25, 2023, without the court's permission in direct violation of California Rules of Court, rule 1.150,[4] and the local rules. The court noted that in father's trial brief, father stated the recording on daughter's phone should be investigated by the Commission of Judicial Performance. The family court also found father recorded a mediation session on daughter's cell phone without permission.

The family court admitted into evidence on father's behalf a two-page letter signed by daughter dated August 11, 2021, marked as exhibit 1, and on mother's behalf seven pages of photographs, marked as exhibit 2, and a thumb drive, marked as exhibit 3. Mother's counsel played various videos before the court. The evaluator, Tercero, was deemed an expert in child custody and visitation matters. Tercero testified and her report was moved into evidence as exhibit 4. Mother's counsel questioned Tercero and entered two pages of drawings into evidence as exhibit 5. Father cross-examined Tercero. Mother's counsel moved two pages of text messages and various letters into evidence as exhibits 6 and 7. Mother's counsel continued with direct examination, presumably of mother, and played videos on the thumb drive. The family court denied both parties' requests for restraining orders. The hearing was continued to March 21.

---

[4]     Further references to rules are to the California Rules of Court.

The March 21 minute order shows that father called mother to testify. Father questioned mother, as did the family court, and mother's counsel cross-examined mother. Father also testified. Mother's counsel moved into evidence daughter's drawings, the supervised visit log, Allivato's letters and treatment summary, labeled exhibits 8 through 12, while father moved a report from child protective services (CPS) into evidence, labeled exhibit 13. Both parties made statements to the court. The family court set a chambers interview with daughter for April 2, with daughter to appear via Zoom. Counsel would not be admitted into the Zoom interview with daughter. The family court asked the parties if they had other evidence, testimony, or information they wished to provide to the court. Both parties replied, "No," and they rested. The family court stated it would take the case under submission after the April 2 chambers interview of daughter.

The family court interviewed daughter under oath via Zoom on April 2. The family court requested a transcript and ordered it sealed.

### The Family Court's Order and Statement of Decision

On April 19, the family court issued the following child custody and visitation orders: (1) mother would have sole legal and physical custody of daughter; (2) father would not have visitation and was prohibited from filing for modification of visitation until he received at least six months of therapy from a licensed therapist which would focus on proper emotional boundaries with daughter; and (3) any future visits between father and daughter would be in conjunction with the recommendations of daughter's therapist.

In conjunction with this order, the family court issued a tentative statement of decision.[5] The family court explained this was an initial custody order which required it

---

[5]    The family court explained it denied the parties' requests for domestic violence restraining orders because neither party provided sufficient evidence to prove that domestic violence was committed by the other party.

6.

to apply the best interest of the child standard. The family court summarized the parties' testimony, as well as Tercero's testimony.

The family court summarized its video conference interview of daughter. The court noted that daughter was bright and engaging during the interview. She stated she lived in San Diego with mother and mother's boyfriend, where she attended Catholic school. Daughter had a difficult time with the other kids in her eighth-grade class and said, "they think I'm different and they erase me from the picture." Daughter said she got along with children from the sixth grade and was friends with them, but she "doesn't fit in" with the kids in her own grade.

Daughter last saw father in November 2023, and while she received a text from him, she did not respond. Daughter wanted to follow the court rules regarding contact with father. She liked living with mother and was less scared than when she lived with father. Daughter said she was "getting better at [mother] being kind to me," and it "feels more free to have my own room and own bed." Daughter had an electric keyboard and enjoyed taking piano lessons, and she continued to practice art.[6]

In its discussion section, the family court noted the parties agreed the problems in their relationship resulted in the complete breakdown of their long-term relationship. While mother testified there were relationship problems before the COVID pandemic, it was clear to the court that the relationship significantly worsened during COVID.

The family court noted that the videos and letters, marked exhibits 3 and 7, clearly showed daughter was extremely emotionally attached to father to the complete exclusion of mother. The videos showed that daughter referred to "Daddy" as her best friend and that she loved him, wanted him to come back, and she didn't "blame my dad." Allivato opined daughter was isolated, as father's homeschooling of daughter left her alone for

---

[6] The family court noted that at the end of the interview, it asked daughter if she had any questions. When daughter asked why she was speaking with the court, the court told her it had to decide on the contact she would have with father, and she should not worry about that decision as that was something for the adults to decide.

most of the day. Allivato opined daughter was being emotionally and psychologically harmed and she would only believe what father told her. The court found the letter daughter wrote to mother (exhibit 7), which blamed her for wrecking the family's home, supported Allivato's analysis, as it was clear daughter received the information in the letter from father and blamed mother for the financial difficulties the parties faced.

The family court found that father wrongfully included daughter in mother's and father's relationship problems. One video played for the court showed that father called daughter to witness an argument between he and mother after mother called the police to report that father was harassing her. Father asked daughter if he harmed "mommy." Daughter responded, "no." In another video from 2021, daughter listed the problems she and father had with mother. Daughter stated she did not want to be with mother after mother called 911 on father and tried to get him arrested, and she only wanted to live with father. She was happy to have such a good dad because he did so much for her, father was her number one best friend, and he loved to take care of them. Daughter did not think mother loved her or daddy anymore, and she wished daddy would stay home with her. In an August 11, 2021 letter (exhibit 1), daughter wrote that she wanted to live with father and mother hurt her by leaving her and daddy for many days and coming home at 8:30 to 9:00 p.m., thinking everything was fine when it was not, and by calling the cops on father twice while daughter was scared. Daughter wanted "to know why she has done this, as we have been waiting for an explanation for nine months?"

The family court found it clear that daughter got her ideas from father, who had the primary role in caring for her, and his close association with her resulted in father placing his and mother's relationship problems directly on daughter. Daughter, however, was not emotionally prepared to handle these issues and compensated for that by solely aligning with father. Father presented daughter's journal from 2019 (exhibit 7) where he told daughter not to be mean to mommy and mother loved daughter so much. The court,

however, noted this was clearly before the problems between the parties became so pervasive during the COVID pandemic.

The family court found that father had not complied with many of the court's orders. He continued to secretly contact daughter even after the court ordered him not to do so, and he had daughter present during at least one of the child custody mediation sessions, where father secretly recorded the session on daughter's phone without court permission. In addition, father took daughter to court with him when mother and father litigated father's eviction from the family home. These incidents showed father's lack of insight into the emotional harm he caused daughter by involving her in these issues.

The family court noted it ordered supervised visits between father and daughter with a professional supervisor, but after one supervised visit daughter significantly emotionally regressed. She cried throughout the visit and stated she wanted to return to father. Daughter threw items around her room, made a mess of the back car seat, and refused to shower.

Before mother obtained sole custody, father and daughter clearly were emotionally bonded to the exclusion of mother, and father relied on daughter for his own emotional support, which caused her to engage in survival behavior. Father supported daughter's emotional attachment to him and her estrangement from mother. Father appeared to lack insight into the negative effect he had on daughter's emotional development and had not acknowledged the emotional toll his actions caused daughter and still contended mother was responsible for daughter's emotional distress.

This contrasted with the family court's observation of daughter's progress while in mother's primary care. Daughter appeared completely different—she felt less fearful in her life circumstances, was attending school and was able to socially engage with other children. The court's interview of daughter showed that she was progressing in her development much more appropriately while in mother's sole care compared to when she was primarily with father.

The family court found that after reviewing all the evidence and considering its discussion, it was in daughter's best interest for the current custody order to remain in place.

On April 25, father filed a 36-page objection to the family court's tentative statement of decision attached to a Judicial Council form declaration. Among other things, father asserted the family court was biased against him, and he was unjustly evicted from the family's home. Father claimed the family court violated his due process rights by sealing the transcript of daughter's court interview and withholding confidential treatment summaries, which were not given to him until the March 20 hearing. Father complained the family court improperly struck evidence of mother's immigration fraud which prevented him from proving why he was unable to claim community property rights and allowed her to evict him from their home in August 2023. Father stated he would not comply with the family court's decision to seek therapy, and he objected to both he and daughter being forced into coercive therapy. Father asserted the family court ignored daughter's voice, letters, and right to custodial preference.

On May 7, mother's attorney served notice of entry of the April 19 statement of decision on father. Father filed a notice of appeal from the April 19 order on May 13.

On May 17, the family court issued a minute order addressing father's April 25 objection. The court stated it was not informed of the objection until May 13 because it was filed as a declaration. The family court stated it considered father's objections and denied them in their entirety, which meant the statement of decision filed on April 19 was the final statement of decision. The family court noted that father continued to violate court orders, as he did throughout the pendency of the case, as he stated he would not comply with the court's current order and admitted he had contact with daughter through a text communication where daughter told father that his prior homeschooling of her was superior to her current school placement.

10.

***Post-Order Proceedings***

On May 23, father filed an "EXHIBIT LIST IN SUPPORT OF APPEAL," to which was attached eight documents that were not entered into evidence at the contested custody hearing.

On June 20, mother's counsel filed a respondent's notice designating the record on appeal. On June 25, father filed a second amended appellant's notice designating the record on appeal. Father elected to proceed with a settled statement, and he filed a proposed settled statement on August 8.

On August 12, a hearing was held on father's motion to unseal the April 2 Zoom interview of daughter, at which mother and father testified. The family court ordered the transcript unsealed and available only to father, mother, and mother's attorney, and that the transcript can be shared only with the parties. The family court further ordered that the parties shall not contact or discuss the contents of the transcript with daughter.

***The Family Court's Settled Statement on Appeal***

On August 19, the family court issued its proposed settled statement on appeal, which it amended the following day. The family court did not accept father's proposed settled statement on appeal filed on August 8, as it did not accurately summarize the witness testimony and physical evidence introduced, and did not accurately contain a narrative of the proceedings as required by rule 8.137(d)(2). The family court accepted father's proposed settled statement only to specify father's grounds of appeal pursuant to rule 8.137(f)(5). The court set out a detailed statement which it proposed to certify as the settled statement on appeal pursuant to rules 8.137(g)(1) and 8.137(f)(4)(A). The court set a hearing on either party's objection to the court's proposed settled statement for September 4 pursuant to rule 8.137(f)(4).

The family court summarized the witness testimony and exhibits from its statement of decision, as well as the undisputed facts which showed father was daughter's primary custodial parent during the parties' relationship.

11.

Father testified that he strongly desired the return of his custody rights—while he wanted sole custody, he was willing to share custody with mother. Father did not believe he did anything to justify the court stopping his contact with daughter. During his testimony, father was very upset that Allivato reported suspected child abuse to CPS as a mandated reporter. Father testified the report was made because he and daughter slept together in the same bed. Daughter reported to Allivato that they slept in the same bed so they were not alone and could be close. Father testified co-sleeping with children was common in his Asian culture, and he accused Allivato of misconduct by making a report to CPS. The family court, however, found Allivato did not commit misconduct; rather, she simply made a mandated report that was required by her position as daughter's therapist.

The family court noted that father presented most of his case through video evidence, which he claimed showed daughter's love and affection for him. Father testified he homeschooled daughter the entire time she was in his primary custody. They completed many activities together, including starting a YouTube channel where daughter discussed financial issues. Father stated daughter had friends from her on-line gaming community, and she was very intelligent and a good artist.

During the hearing, the family court found that father did not commit sexual abuse against daughter, as daughter never reported father sexually abused her, mother stated she did not believe daughter was sexually abused, CPS did not find any evidence father committed sexual abuse, and there was not any other evidence submitted of sexual abuse.

The family court noted that both parties repeatedly exhibited over-emotionality during the pendency of the case. During the February 22 hearing, father cursed at the court and had to be escorted out of the courtroom by law enforcement. Father cried and audibly sobbed when certain family videos were played during the trial on child custody. Mother also cried and became overly emotional during her trial testimony. The family

court had to frequently intervene to lower the tension and calm down the parties to allow each side to present their evidence.

The family court summarized mother's testimony. Mother stated it had been difficult for daughter to be in her care, as daughter was not socialized with her peer group and had difficulty making friends. Mother thought this was because father homeschooled daughter and isolated her from other children. Mother believed father "brainwashed" daughter against her. Daughter's therapist stated daughter had the emotional maturity of a nine- or 10-year-old child. When mother first gained sole custody of daughter, daughter frequently lashed out by telling mother she was stupid, which father frequently told mother during their relationship. Daughter did not know how to groom herself or conduct routine hygiene tasks. Daughter, however, was doing better emotionally. She was seen by a psychologist and psychiatrist. She had been accepted into the ninth grade and had some friends at school. Mother shared pictures from exhibit 2, which showed daughter appropriately dressed and socializing with her friends in school.

The family court also summarized the testimony of Tercero, the appointed Family Court Services evaluator who the court accepted as an expert child custody recommending counselor. Tercero spoke to both parents and to daughter. She met with daughter for about two hours, reviewed filings by each parent, and reviewed Allivato's letter to the court. Tercero opined daughter was unable to form emotional bonds with children her own age; at times daughter presented as a child her own age and at other times presented as more child-like. Daughter cried throughout Tercero's interview and emotionally withdrew into herself. Daughter told Tercero she cut herself because "she couldn't help the father's situation," and she cut herself while in father's care but not while in mother's care.

Daughter told Tercero that father was her best friend, and she stayed home until he returned from work. Tercero stated daughter knew everything about father's financial accounts and court proceedings. Daughter described mother as an evil person for taking

13.

father away from her. Daughter stated father took her to the CPS office so he could clear his name, and she blamed mother for the abuse allegations. Daughter told Tercero she used to sleep in the same bed with father but that stopped after the CPS worker came to the hotel where she and father were staying.

Tercero testified there was a negative emotional impact to father's relationship with daughter because it impacted her ability to navigate the world successfully on her own. Tercero explained that by father sharing adult matters with daughter, daughter assumed a negative narrative toward mother because daughter did not have the emotional capacity to process the information. Tercero further explained that children in these situations go into a survival mode where they align with the parent they believe is the strongest, which manifested here by daughter being unable to stop yelling at mother. Daughter also identified a personality split between herself and another personality named Violet, who came out when she was computer gaming, was depressed, or wanted to self-harm. Daughter stated Violet would tell her not to do it.[7]

Tercero recommended that daughter stay in mother's sole custody and father obtain a psychological evaluation to help him develop better emotional regulation and boundaries before he could have contact with daughter. Tercero identified several areas of concern: (1) father took daughter to CPS to clear his name and to court when the parties participated in an unlawful detainer action and involved her twice in child custody mediation even after being told she could not be present; and (2) father did not follow court orders as he continued to contact daughter even after being ordered not to do so. Tercero stated that any contact between father and daughter should occur in a professional setting.

The family court stated the entire court interview with daughter was recorded by a court reporter and certified the reporter's transcript was the settled statement of her

---

[7]     Father disputed Tercero's testimony that daughter had a split personality named Violet and claimed Violet was daughter's gaming avatar.

14.

statement to the court. The family court noted it informed the parties that it would speak to daughter and consider her input when deciding the child custody issue as required by Family Code section 3042, subdivision (e), and rule 5.250, and no party objected to the court speaking with daughter.

Finally, the family court noted that its April 19 statement of decision detailed the exhibits received and the court's analysis of those exhibits. In addition, the court exhibit list filed March 21, and its minute orders dated March 20 and 21, detailed all the exhibits that were admitted and whether an objection was made to them. The family court certified these documents as the settled statement on appeal for the exhibits and physical evidence.

On August 27, father filed objections to the family court's amended proposed settled statement. At the September 4 hearing, the family court noted that while mother did not object to its proposed settled statement, father filed numerous objections. The family court stated it considered all of father's objections and denied them. Accordingly, the family court certified its August 20 proposed settled statement on appeal as the settled statement pursuant to rule 8.137(h). The family court noted that during the hearing, after father confirmed the court received his objections, he started arguing with the court and stating the court "violated his rights" and he wanted to "cross-examine" his daughter. The family court then concluded the hearing.

On September 6, the family court judge issued a minute order recusing himself from hearing all proceedings in the matter pursuant to Code of Civil Procedure section 170.3. The clerk reassigned the case to another superior court judge for all future hearings.

## DISCUSSION

Father does not challenge the sufficiency of the evidence to support the family court's custody order. Instead, he contends his constitutional rights were violated, raises various evidentiary errors, and argues the family court was biased against him.

15.

Before reaching father's claims we note that an order challenged on appeal is presumed to be correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) It is father's burden as the appellant to "demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.) To affirmatively show that error occurred, an "appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408; see *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 685 ["appellant must affirmatively demonstrate error through reasoned argument, citation to the appellate record, and discussion of legal authority"].) "[C]onclusory claims of error will fail." (*In re S.C.*, at p. 408.) Furthermore, the failure to provide an adequate record for meaningful review of an issue requires that the issue be resolved against the appellant. (*Gee v. American Realty & Construction, Inc.* (2002) 99 Cal.App.4th 1412, 1416; *Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502.)

## I.    Father's Due Process Rights

Father contends his due process rights were violated because the family court: (1) refused to provide him with an unredacted CPS report; (2) sealed the reporter's transcript of daughter's testimony for four months; and (3) denied a motion he filed on September 9 to provide him with an unredacted CPS report and to recover his daughter's phone, on which was recorded the September 2023 mediation and court session. Father asserts these rulings amounted to the withholding of evidence which deprived him of the opportunity to present his case.

The 14th Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." That amendment guarantees the right to a fair process in court proceedings. Certain "basic procedural protections" must be provided before a state deprives a person of property.

16.

(*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 651.) "Due process requires 'notice, an opportunity to respond, and a hearing.' " (*Shenefield v. Shenefield* (2022) 75 Cal.App.5th 619, 631.) The fundamental requirement is an opportunity to be heard at a meaningful time and in a meaningful manner. (*Mathews v. Eldridge* (1976) 424 U.S. 319, 333; *Fuentes v. Shevin* (1972) 407 U.S. 67, 80 ["the central meaning of procedural due process" requires " '[p]arties whose rights are to be affected are entitled to be heard' " and to enjoy that right " 'they must first be notified' "; the right to notice and an opportunity to be heard " 'must be granted at a meaningful time and in a meaningful manner' "].)

With respect to the CPS report, the record shows father entered the report into evidence at the contested hearing, in which the following identifying information was redacted: (1) the reporting party's name; (2) mother's, father's and daughter's social security numbers and dates of birth; and (3) mother's name and phone number. Even if father were entitled to an unredacted report, father has not shown prejudice from the family court's failure to provide one. (Cal. Const., art. VI, § 13 [reversal is warranted only if the appellant establishes a miscarriage of justice].) In its statement of decision, the family court assumed that Allivato was the reporting party, and it made a finding during the hearing that it did not find father sexually abused daughter, in part because CPS did not find any evidence of sexual abuse. Father does not identify any redacted information in the report that would have helped his case or explain how obtaining an unredacted report would have changed the outcome of the family court's custody decision.

With respect to the transcript of daughter's testimony, the family court questioned daughter via Zoom outside the presence of the parties and mother's attorney. Although the court ordered the transcript sealed, it summarized daughter's testimony in its statement of decision. It is proper for a judge to question a child with the knowledge and consent of the parties or their attorneys. (*Tarling v. Tarling* (1960) 186 Cal.App.2d 8, 11;

17.

Fam. Code, § 3042, subd. (f)(1) ["the court shall not permit a child addressing the court regarding custody or visitation to do so in the presence of the parties"].) The parties and mother's attorney knew about the interview and there is nothing in the record to indicate that they did not consent to it.

Father contends the trial court's sealing of the transcript constituted a form of evidence suppression in violation of *Brady v. Maryland* (1963) 373 U.S. 83, in which the United States Supreme Court held that the prosecution's suppression of evidence favorable to a criminal defendant violates due process where the evidence is material to guilt or punishment. (*Id.* at p. 87.) This case, however, applies only to criminal prosecutions and father does not cite any authority that it applies to child custody proceedings.

Moreover, father has not shown a reasonable probability the transcript would have produced a different result had he received it earlier. After father filed his notice of appeal, the family court granted father's motion to unseal the transcript, and the transcript is part of the appellate record. Although father now has access to the transcript, he does not use it to challenge the family court's custody findings.

The only argument father raises with respect to the family court's interview of daughter is that the court refused to allow daughter to express her custodial preference. Contrary to father's assertion, the family court was not required to ask daughter who she preferred to live with. Family Code section 3042, subdivision (a), provides, "If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody or visitation, the court shall consider, and give due weight to, the wishes of the child in making an order granting or modifying custody or visitation." A child 14 years of age or older who wishes to address the court regarding custody or visitation must be permitted to do so unless the court determines it is not in the child's best interest. (*Id.*,

§ 3042, subd. (c).)[8] But where, as here, the child is under 14 years of age, the court has discretion to allow the child's testimony on custody or visitation "if the court determines that is appropriate pursuant to the child's best interest." (*Id.*, subd. (d).) The statute "does not require the child to express to the court a preference or to provide other input regarding custody or visitation." (*Id.*, subd. (i).) "In many cases it may be quite unwise to inquire as to the child's preference; doing so may destroy what little good will is left between the [parties] or between one of the [parties] and the child." (*Stack v. Stack* (1961) 189 Cal.App.2d 357, 364–365.)

This appears to be such a case. The evidence showed, as the family court found, that father and daughter were emotionally bonded together to the exclusion of mother, and father relied on daughter for his emotional support. Father placed his relationship problems with mother directly on daughter, who was not emotionally prepared to handle those issues and compensated for that by aligning with father. Daughter had previously expressed her desire to live with father, but as the family court discovered when interviewing daughter, daughter's development progressed more appropriately while in mother's care when compared to father's. Although the family court did not directly ask daughter with whom she wanted to live, daughter told the court she did not want to talk to or have contact with father, she felt more free living with mother and felt better living with her, and she was less scared than when she lived with father. Nothing in the record indicates the family court refused or failed to consider daughter's preferences in making its custody determination. Accordingly, father has not established that the family court erred in not directly asking daughter about her preferences.

---

[8] Family Code section 3042, subdivision (c) requires the court, if it determines it is not in the best interest of a child 14 years of age or older to address the court regarding custody or visitation, to state its reasons for that finding on the record. Father contends the family court here erred in not stating on the record why it did not allow daughter to testify about her preferences. This subdivision, however, does not apply here, where daughter was 13 years old when she testified. Moreover, there is nothing in the record to suggest that daughter wished to tell the family court her preference.

More importantly, "the court is not bound to decide according to [a child's] preference and may award custody consistent with its finding of the best interest of the child[]." (*In re Marriage of Hopson* (1980) 110 Cal.App.3d 884, 907; accord *Tarling v. Tarling*, *supra*, 186 Cal.App.2d at pp. 9–11, 12 [court did not abuse its discretion in denying change of custody, even though child preferred to live with his father rather than his mother].) Even if daughter expressed a preference to live with father, the family court reasonably could find that it was not in her best interest to live with him, as father lacked insight into the negative effect he had on daughter's emotional development and failed to acknowledge the emotional toll his actions took on her.

Father asserts daughter was of sufficient age and maturity to express her preferences and if she had been allowed to testify, she would have provided insight into her well-being and emotional connection to father. Daughter, however, did testify and provide insight into her well-being and connection to father. The cases father cites do not require the family court to ask a child under 14 years of age about the child's preferences. (See *In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 964, fn. 11 [while a trial court may consider and give due weight to a child's wishes if the child is of sufficient age and capacity to form an intelligent preference as to custody, it need not call a child as a witness where the child's best interest dictates, and instead may provide alternative means of obtaining information regarding the child's preferences]; *In re Marriage of Rosson* (1986) 178 Cal.App.3d 1094, 1102–1103 [a court must give a child's preference "serious consideration" where the issue is whether children will be moved from the community where they lived most of their lives, an excellent parent who remains in the community wishes the children to reside with him or her, and the children have expressed a preference to remain in the community].) Moreover, there is nothing to suggest the family court did not give serious consideration to daughter's preferences.

Father contends the family court erred in denying his motion to remove the redactions in the CPS report and to recover daughter's phone, which was filed after he

filed the notice of appeal. Father asserts that without access to the recording of the September 2023 mediation and court hearing and the unredacted CPS report, he was denied the opportunity to present crucial facts in his defense.

The motion, however, is not in the appellate record. A party challenging a ruling by the trial court has the burden of showing reversible error by an adequate record. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574.) An appellant's failure to do so results in a finding that he or she has defaulted and that the trial court's decision must be affirmed. (*Jameson v. Desta*, *supra*, 5 Cal.5th at pp. 608–609.) Therefore, since father's motion is not in the record, we cannot review whether the family court erred in denying it.

Father also asserts he was unlawfully deprived of his home when mother evicted him from it despite his financial contributions toward its purchase and maintenance. He asserts he was deprived of his property rights because the court failed to provide him with a fair opportunity to contest the unlawful detainer action. This action and appeal, however, concern only child custody—it is not the unlawful detainer action, which would have been filed under a different case number. The family court did not make any decision about the family home, as that issue was not before it. Accordingly, any issue about father's eviction from the home or his contributions toward it are not before us.

In sum, father has not shown that his due process rights were violated.

## II.    First Amendment Rights and the Right Against Self-Incrimination

Father contends his First Amendment right to petition for redress of grievances was violated when the family court: (1) withheld crucial evidence, namely, the unredacted CPS report and the transcript of daughter's testimony; (2) denied his September 9 motion to recover daughter's phone and remove the redactions on the CPS report; and (3) refused to allow daughter to testify about her custodial preferences.

"The right to petition the government for redress of grievances is protected by both the federal and state Constitutions. (U.S. Const., 1st Amend.; Cal. Const., art. I, § 3.)" (*Vargas v. City of Salinas* (2011) 200 Cal.App.4th 1331, 1342.) The right has been

21.

construed to encompass the right to petition the judicial branch for resolution of legal disputes. (*Ibid.*, citing *California Motor Transport Co. v. Trucking Unlimited* (1972) 404 U.S. 508, 510; *Borough of Duryea v. Guarnieri* (2011) 564 U.S. 379, 387 (*Guarnieri*); cf., *id.* at p. 402 (conc. & dis. opn. of Scalia, J.) ["The Court has never actually *held* that a lawsuit is a constitutionally protected 'Petition' "].)

Father, however, does not cite any authority that the right to petition extends to evidentiary rulings made during litigation. The right to petition the government has never been considered absolute. (*Vargas v. City of Salinas*, *supra*, 200 Cal.App.4th at p. 1342; *Bill Johnson's Restaurants, Inc. v. NLRB* (1983) 461 U.S. 731, 743 (*Bill Johnson's Restaurants*) ["baseless litigation is not immunized by the First Amendment right to petition"].) The right does not compel the government to listen or grant relief. (See *Smith v. Arkansas State Highway Employees, Local 1315* (1979) 441 U.S. 463, 465 (*per curiam* ) ["the First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize the association and bargain with it"]; *We the People Foundation, Inc. v. United States* (D.C. Cir. 2007) 485 F.3d 140, 143–144 [no right to receive response to or official consideration of a petition]; *Canfora v. Olds* (6th Cir. 1977) 562 F.2d 363, 364 [no constitutional guarantee that petitions for the redress of grievances will succeed].)

The cases father relies on, *Guarnieri* and *Bill Johnson's Restaurants*, do not state the right to petition extends to evidentiary procedures. *Guarnieri* addressed "the extent of the protection, if any, that the Petition Clause grants public employees in routine disputes with government employers." (*Guarnieri*, *supra*, 564 U.S. at p. 382.) The United States Supreme Court described the right of petition as "the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." (*Id.* at p. 387.) This general statement does not establish whether evidentiary rulings made during litigation implicates the petition clause. (See *Guarnieri*, at pp. 388–

22.

389 [a petition conveys the author's special concerns to the government and requests government action to address those concerns].)

In *Bill Johnson's Restaurants*, the United States Supreme Court considered whether the National Labor Relations Board may issue a cease-and-desist order to halt an employer's prosecution of a state court civil suit brought to retaliate against employees for exercising federally protected labor rights without a finding the suit lacked a reasonable basis in fact or law. (*Bill Johnson's Restaurants*, *supra*, 461 U.S. at p. 733.) The court decided such an order may not be issued unless the suit lacks a reasonable basis, noting that such suits are not within the scope of First Amendment protection because the First Amendment does not immunize "baseless litigation." (*Bill Johnson's Restaurants*, at pp. 743, 748–749.)

Father also contends his Fifth Amendment right against self-incrimination was violated because the family court refused to provide him with the unredacted CPS report, sealed daughter's transcript, and refused to allow daughter to testify. Father's argument is meritless, as the evidence he cites did not require him to give testimony that might incriminate him. "As a matter of constitutional protection, criminal defendants cannot be compelled to testify against themselves. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15.) Furthermore, witnesses in both criminal and civil proceedings have the right to refuse to answer any question that might tend to incriminate them. (Evid. Code, § 940.)" (*Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1097–1098, fns. omitted.) Father does not cite to any question he either was compelled to answer or refused to answer that he believed would tend to incriminate him.[9]

---

[9] In a section of his brief labeled "Statement of Appealability," father asserts in passing that he seeks appellate review of other issues, namely, that Allivato fabricated her reports, the court denied him access to Allivato's reports, and his First Amendment right to free association was violated when the family court restricted his contact with daughter. In the same section, father asserts the Commission on Judicial Performance, Board of Behavioral Sciences, and the Complaint Review Unit of the State Bar of California enabled ongoing misconduct in the family court through their inaction as they

In sum, father has not shown any violation of his First Amendment right to access the courts or his Fifth Amendment right against self-incrimination.

## III. Judicial Bias and Recusal

Father contends the family court judge assigned to his case was biased against him as evidenced by: (1) the exclusion and withholding of key evidence, such as sealing daughter's transcript and not including the CPS report as an exhibit; (2) rulings that consistently favored mother, such as striking evidence of mother's immigration fraud; (3) refusing to admit exculpatory evidence, such as the unredacted CPS report; and (4) the judge's recusal at the conclusion of the case.

Case law has recognized that California has a substantial statutory system available to address alleged judicial bias, which "requires those concerned about judicial bias to file in the trial court and, if dissatisfied, to petition for writ of mandate, which is the exclusive means of review." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 588; Code Civ. Proc., § 170.3, subds. (c) & (d).)[10] The failure to raise a challenge of bias

---

failed to act on father's complaints against the family court judge, Allivato, and mother's attorney, and the family court was biased against fathers in violation of the Fourteenth Amendment's equal protection clause.

Father failed to articulate an intelligible argument on these issues supported by appropriate authority and citations to the record in the argument section of his brief. We therefore need not consider these issues. (See *Wright v. City of Los Angeles* (2001) 93 Cal.App.4th 683, 689 ["asserted grounds for appeal that are unsupported by any citation to authority and that merely complain of error without presenting a coherent legal argument are deemed abandoned and unworthy of discussion"]; *300 DeHaro Street Investors v. Department of Housing & Community Development* (2008) 161 Cal.App.4th 1240, 1257 [appellant forfeited argument "by failing to brief it properly under a separate heading … and … failing to provide adequate legal analysis"]; rule 8.204(a)(1)(B) [each brief must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"].)

[10] Code of Civil Procedure section 170.3, subdivision (c) sets out the procedure when a party seeks to disqualify a judge for cause, and requires a party to seek disqualification " 'at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification.' " (*Tri Counties Bank v. Superior Court* (2008)

in the trial court will result in a waiver of this issue on appeal. (*Tri Counties Bank v. Superior Court*, *supra*, 167 Cal.App.4th at pp. 1337–1338.)

Here, while father raised the issue of judicial bias when designating the record on appeal and in his proposed settled statement, he did not raise the issue with respect to the family court's evidentiary rulings during the contested custody hearing or before the family court issued its decision. Therefore, at a minimum, father's claim of bias with respect to the family court's conduct of the contested hearing is waived.

Even if not waived, the claim fails. A trial court's repeated rulings against a party are not grounds for finding bias. (*Schmidt v. Superior Court*, *supra*, 44 Cal.App.5th at p. 589; *Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 795–796.) Father's arguments appear to attack evidentiary rulings within the family court's discretion, and therefore do not demonstrate bias. (See, e.g., Evid. Code, § 352 [court has discretion to exclude evidence if probative value is substantially outweighed by undue consumption of time or substantial danger of undue prejudice or confusion].)[11]

Father also asserts the judge's post-decision recusal along with the unexplained withdrawal of mother's attorney at the conclusion of the custody matter suggest potential misconduct or bias that was concealed from the parties and shows that the judge should have recused himself earlier in the case. The family court judge recused himself pursuant to Code of Civil Procedure section 170.3, without stating the basis for his recusal. That

---

167 Cal.App.4th 1332, 1337.) A failure to comply with the promptness requirement "constitutes forfeiture or an implied waiver of the disqualification." (*Ibid.*)

[11] The Honorable Joseph R. Distaso was the judge throughout most of the proceedings. In his appellate brief, father mentions another judge, the Honorable Alan Cassidy, in his statement of appealability and statement of facts, asserting Judge Cassidy displayed bias in his rulings, which he claims were based on "Title IV-D financial incentives." The record shows that Judge Cassidy presided over one hearing on June 27, 2023. The minute order of that hearing states the parties met and conferred and discussed the issues, but were unable to reach an agreement, and the court set a two-day trial for March 20 and 21 on the parties requests for domestic violence restraining orders and economic issues. There is nothing to suggest bias during this hearing.

the judge did so at the conclusion of the custody matter does not indicate that he was biased against father during the proceedings. Father claims the judge's evidentiary rulings show bias, but he does not directly challenge those rulings on appeal, which is his recourse if he believed the rulings were erroneous. Mother's attorney's withdrawal also does not infer bias or collusion—the attorney likely decided not to represent mother on appeal.[12]

## DISPOSITION

The family court's April 19, 2024 order is affirmed.

DE SANTOS, J.

WE CONCUR:

LEVY, Acting P. J.

MEEHAN, J.

---

[12] Father also asserts that he filed a complaint against Judge Distaso with the Commission on Judicial Performance (the Commission), which the Commission closed in March 2024. Noting that Commission rules mandate the confidentiality of the Commission's investigation, father argues such a rule raises concerns about the integrity of the trial proceedings and suggests that judicial misconduct may have been concealed. Father does not cite any authority to support this proposition, and we fail to see how confidentiality of Commission proceedings, particularly where the Commission declines to act on the complaint, indicates judicial misconduct occurred.